In re **FIRST DATABANK ANTITRUST LITIGATION.**

No. 1:01CV00870.

United States District Court, District of Columbia.

May 21, 2002.

Matthew F. Pawa, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for J.B.D.L. Corp.

William A. Isaacson, Boies & Schiller, L.L.P., Washington, DC, for Class plaintiffs.

Alan H. Rolnick, Hanzman & Criden, P.A., Coral Gables, FL, for South Park Pharmacy, Inc., Eddie's Pharmacy, Inc.

Kenneth Anthony Gallo, Clifford, Chance, Rogers & Wells, LLP, Washington, DC, for Hearst Trust, Hearst Corp., First Databank, Inc.

Melvin Howard Orlans, Fed. Trade Com'n, Washington, DC, for Federal Trade Com'n.

### MEMORANDUM AND ORDER

JACKSON, District Judge.

#### I.

On April 5, 2001, the Federal Trade Commission ("FTC") filed suit in this Court under the Clayton and Federal Trade Commission Acts against The Hearst Trust, Hearst Corporation, and First Databank, Inc., to dissolve a merger in 1998 of the nation's two principal vendors of integratable drug information databases. The FTC also sought disgorgement of unlawful monopoly profits earned by the defendants while they dominated the market, as well as civil monetary penalties for their various transgressions.[1]

Prior to filing suit the FTC had pursued an exhaustive 20–month investigation into the defendants' activities beginning in late 1999. During the course of its investigation, the FTC asserts, it expended over 25,000 hours of investigators' time, obtained production of and reviewed some 400 boxes of documents produced in response to approximately 40 subpoenas, and conducted 20 investigational hearings and over 60 interviews. In short, it had made its case in advance of filing suit.

Indicative of that fact, on April 13, 2001, barely a week after the FTC had filed suit, defendants informed the FTC that they wished to settle. Defendants offered a total payment of $18 million, of which $16 million would constitute a disgorgement of profits, in addition to an essentially complete divestiture of assets. The FTC says that it was content with the $16 million disgorgement figure at that time, but no formal settlement understanding was signed because the amount of civil penalties to be paid remained to be determined, as did resolution of the even more critical matter of when and to whom the divestiture of assets would be made. The FTC also asserts that it was amenable to defendants' proposal that any disgorgement monies be subsumed into a settlement of an anticipated class action by aggrieved consumers, subject, however, to two conditions: none of the $16 million to be disgorged was to be used to pay attorneys' fees, and the FTC also insisted upon an increase in the amount of disgorgement of $1 million per month for each month after September 1, 2001, that divestiture was delayed.

On April 20, 2001, the plaintiffs in this litigation filed the first of these now-consolidated private class actions, alleging damages based upon substantially the same misconduct alleged in the FTC's suit against the defendants.[2] From that point forward, the private actions appear to have proceeded towards settlement in tandem with closure of the FTC's case. Evidence normally obtained by protracted discovery was voluntarily disclosed. No formal discovery was ever initiated, and no contested motions were filed. By August, 2001, plaintiffs had divided themselves by consent into two broad classes for settlement

---

1. *Federal Trade Commission v. The Hearst Trust, et al.*, Civ. No. 01–0734. First Databank, Inc., a wholly owned subsidiary of the Hearst Corporation (owned by The Hearst Trust) had acquired its chief competitor, Medi–Span, Inc., the effect of which, the FTC charged, was to create a monopoly in the market for the product, and a consequent drastic increase in its price and decrease in quality and service.

2. The private class action suits—a total of eight in all—were consolidated without opposition on August 16, 2001, as *In re: First Databank Antitrust Litigation*, Civ. No. 01–0870. Plaintiffs in the class action lawsuits are various purchasers of electronic integratable drug information databases from defendants, *post*-merger, such as hospitals, pharmacies, drug wholesalers, physicians, health care plans, insurers, and the like.

purposes: a "direct" purchasers' class and an "indirect" purchasers' class. The direct purchasers' class ultimately totaled approximately 6000 members.

On December 18, 2001, the Court approved a settlement in the form of a consent judgment in the FTC case that implemented a complex plan of divestiture of a multiplicity of specified assets, accompanied by a $19 million profit disgorgement, plus payment of civil penalties. The FTC explains that the $19 million disgorgement figure represented the amount the parties had preliminarily agreed upon as early as April of 2001—$16 million—plus the $1 million monthly increment also agreed upon from and after September 1, 2001. Disgorgement was expressly declared to be "for the purpose of settling the [private] class action lawsuits."

Two months later, on February 14, 2002, the Court gave final approval to settlements with both classes of plaintiffs, but it also gave leave to the FTC to intervene in this private litigation for the limited purpose of opposing the petition of class counsel for the *direct* purchasers' class for an award of what it deemed excessive attorneys' fees. That petition, as opposed by the FTC, is presently before the Court. The FTC has not opposed the fee petition of counsel for the *indirect* purchasers' class.

Class counsel for the direct purchaser settlement class are requesting attorneys' fees of roughly 22% of the direct purchaser settlement payment, or $5,115,000, including interest, their own expenses of $52,911.87, and the outstanding fees of and

expenses incurred by their experts of $53,884.74. The current balance in the direct purchasers settlement account is approximately $25 million, including interest.[3]

## II.

"[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The D.C. Circuit has employed the percentage-of-the-fund method for determining the amount of attorneys' fees to be awarded in common fund cases, and while according the district court considerable latitude on the issue of reasonableness, has observed that "a majority of common fund class action fee awards fall between twenty and thirty percent."[4] *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1265, 1271–72 (D.C.Cir.1993).

In its opposition to the fee petition filed by counsel for the direct purchaser settlement class (hereinafter "class counsel"), the FTC takes the position that the fee requested is unreasonable because it is calculated as a percentage of the entire $24 million disgorgement amount. The FTC argues that class counsel's fee award, if within the 20–30 percent range, should be based on a percentage of only the value added to the common fund attributable to the efforts of private class counsel—at most, in this case, the $8 million above the $16 million disgorgement amount to which defendants had already committed them-

---

**3.** On August 13, 2001, less than four months after the class actions had commenced, a direct purchaser settlement payment of $23.25 million was deposited by defendants in anticipation of settlement into the "Direct Purchaser Settlement Account" along with $279,000 in interest. As of January 8, 2002, the balance in the settlement account was

$24,638,561. Direct purchasers' class counsel base their requested fee on a percentage of the principal settlement amount.

**4.** Class counsel in common fund cases are also entitled to "reasonable litigation expenses from that fund." *Lachance v. Harrington,* 965 F.Supp. 630, 651 (E.D.Pa.1997).

selves to the FTC as of April 13, 2001, a week before class plaintiffs appeared on the scene.

The FTC submits that private attorneys' fees in a case that rides "piggyback" on a prior case, in particular one in which the government conducts the investigation and performs much of the "spadework," should reflect the effect of the government's involvement in determining what represents a reasonable award, citing *inter alia*, *Swedish Hosp. supra*, and such cases as *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir.2000) and *Donnarumma v. Barracuda Tanker Corp.*, 79 F.R.D. 455 (C.D.Cal.1978).[5] The government's substantial involvement not only reinforces a private plaintiff's case, but also reduces the risk of nonpayment of class counsel, as well as the need for, and value of, highly skilled and experienced class counsel.

In the instant case, the FTC asserts, class counsel was not even required to prepare, much less litigate the case on the merits. Their task was simply to negotiate a supplemental recovery upward from the $16 million already "on the table," plus the $3 million increment for delay also already acceded to by defendants.

Class counsel respond that the FTC's interest in effective disgorgement in furtherance of law enforcement is not impaired by approving a $5.115 million fee here, because the entire $19 million negotiated by the FTC as representing defendants' ill-gotten gain will be available for distribution to injured consumers, even after payment of the requested fee, and will more than suffice to make all of them entirely whole. Moreover, they say, their requested fee as a percentage of the fund (equivalent to between 21–22%) is already substantially discounted below prevailing contingent fee agreement rates typically charged in such cases. They cite to the example of *In Re Vitamins Antitrust Litig.* No. 99–197, MDL No. 1285, 2001 WL 856290 (D.D.C. July 16, 2001), wherein the court approved a fee of over one-third of the entirety of the common fund in a case in which the class settlement was concluded with defendants who were facing a criminal prosecution at the time, and the total amount of compensatory damages recovered was vastly higher. Class counsel also suggest that, as a matter of sound judicial administration, the practice of routinely cutting fees will be detrimental in the long run to the objective of attracting quality representation for similar classes in the future because there is "no or little prospect that highly qualified counsel will be consistently available to class members at below market rates." Finally, class counsel submit that the magnitude of the FTC's actual contribution to any accretions to the settlement amount is speculative: they emphasize that plaintiffs had reached agreement with defendants on the amount of settlement four months before the government's case concluded in December, 2001. Moreover, whereas class counsel devoted their efforts exclusively to obtaining a maximum recovery for their clients, disgorgement was a secondary or tertiary objective for the FTC: restoration of a functional competitive market and the imposition of punitive civil monetary penalties were a higher priority to the FTC. Had there been no settlement agreement between the plaintiffs and defendants as negotiated by class counsel, it is unknown how aggressively the FTC would have pursued disgorgement. In fact, say class counsel, prior to this case, the FTC has not pursued disgorgement with any particular vigor.

---

5. Neither the *Goldberger* nor *Donnarumma* cases are altogether apposite. *Goldberger* was preceded by a successful criminal prosecution of others involved in the same fraudulent scheme. *Donnarumma* reduced compensation for counsel for minor plaintiffs in a maritime tort action based upon the findings of a Coast Guard investigation.

In *In re Vitamins*, the district court awarded class counsel an attorneys' fee of approximately 34% of the total estimated settlement amount[6] in a class action lawsuit against seven international vitamin manufacturers and their affiliates for alleged price fixing of certain vitamin products sold for delivery in the United States. The district court found the fee award reasonable because, although at or even somewhat above the upper end of the "reasonable" range, certain factors considered relevant by other federal circuits all supported the award. *Id.* at 25. Specifically, the *In re Vitamins* court observed that counsel had (1) obtained "one of the highest percentage recoveries recorded, in one of the largest antitrust settlements on record;" (2) evinced a high degree of skill and experience in doing so; (3) "completed a substantial portion of their investigation prior to the implementation of any government investigation" into the alleged misconduct; (4) achieved the settlement expeditiously; and (5) successfully defended against various motions to dismiss. *Id.* at 25–27 (applying factors enumerated in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195, n. 1 (3rd Cir.2000) and *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445, n. 3 (10th Cir.1995)).

This case, however, more closely resembles Swedish Hospital and is distinguishable from *In re Vitamins* in several respects. In *Swedish Hospital*, the D.C. Circuit reviewed the district court's approval of a fee award in a class action suit brought by several hospitals against the Department of Health and Human Services ("HHS"), attacking the department's policy of not reimbursing hospitals for photocopying costs they incurred as a result of meeting mandatory documentation requirements of the Medicare program. *Swedish Hospital*, 1 F.3d at 1263. The *Swedish Hospital* class action followed the filing of several similar suits elsewhere against HHS on the same grounds in which other federal courts had held that the photocopying rule was arbitrary and capricious, and therefore unenforceable. *Id.* at 1263–64. During the pendency of the appeal of one of these suits, HHS capitulated on the issue and proposed its own agency rule that would reimburse all hospitals at approximately $.05 a page for required photocopying under the Medicare program. *Id.* at 1264. The *Swedish Hospital* class plaintiffs then ultimately settled with HHS for $27.8 million, a figure representing reimbursement of approximately $.07 a page. *Id.* Class counsel for the *Swedish Hospital* class plaintiffs sought a percentage-of-the-fund fee award of 20% of the entire $27.8 million settlement amount, but the district court, accepting counsel's requested percentage figure, nevertheless concluded that counsel could "claim credit only for enhancing" the fund in the amount of approximately $.02 more per page than the $.05 a page that HHS had already put "on the table when negotiations opened." *Id.* (quoting *Swedish Hosp. Corp. v. Sullivan*, Medicare & Medicaid Guide (CCH) ¶ 39, 730, 1991 WL 319154 at *2 (D.D.C. Dec.20, 1991)). Accordingly, the district judge awarded class counsel a fee of $2 million, or 20% of the $10 million portion of the settlement amount for which class counsel was responsible. *Id.*

In affirming the district court's fee award, the D.C. Circuit stated that the twenty percent figure was within the 20–30% range of reasonable fees awarded in other common fund cases. *Id.* at 1272. Moreover, it went on to hold that it was reasonable for the district court to base fee

---

**6.** The fee award amounted to $123,188,032, plus interest. The nature of the settlement required the court in that case to undergo a lengthy analysis in calculating the value of ultimate settlement amount to be $359,438,032.

calculations "only on that part of the fund for which counsel was responsible. [T]he District Court's conclusion that, to a considerable extent, this case rode 'piggyback' on [a preceding case] is entitled to deference...." *Id.* The district court, in other words, had appropriately exercised its discretion.

■ As had the plaintiffs in *Swedish Hospital,* these class plaintiffs filed their suit after a predecessor litigant—in this case, the FTC—had already expended substantial effort to establish the liability of the defendants, and defendants had, in effect, acknowledged it by proposing a $16 million disgorgement of funds for the benefit of injured consumers. Class counsel offer no evidence to call into question the FTC's assertion that defendants had committed to pay at least $16 million well before the first private class action had been filed.

Finally, whereas class counsel in *In re Vitamins* were obliged to fend off several attempts to force a dismissal of the complaint in that case before the subject of settlement was broached, class counsel's litigative efforts here were devoted entirely to persuading defendants to increase their offer, facilitated by unresisted discovery. While "counsel should not be penalized for achieving an effective and efficient settlement," *In re Vitamins,* MDL No. 1285 at 26–27 (citing *Gunter,* 223 F.3d at 198), this Court must acknowledge the relative difficulty of the work required of class counsel in the two cases: This case simply did not require the same heavy lifting demanded of class counsel in *In re Vitamins.*

For the forgoing reasons, the Court will award class counsel for the direct purchaser settlement class a fee calculated at thirty percent (30%) of the $8 million attributable to their efforts, or $2.4 million.

Class counsel for the direct purchaser settlement class also request reimbursement on behalf of all class plaintiffs' counsel in the amount of $52,911.87 for a variety of expenses necessarily incurred in the course of the case, and certain expenses incurred by the experts they consulted, totaling $53,884.74. Affidavits from each class plaintiffs' firm concerning these expenses are attached as Exhibit 1 to the Joint Declaration of Class Plaintiffs' Co-lead Counsel in Support of Final Settlement Approval. The Court has no reason to doubt them in any respect and will grant the request in full.

Finally, class counsel for the indirect purchaser settlement class request that the Court award them attorneys' fees of $275,000, plus interest, and their litigation expenses of $16,064.50. The requested attorneys' fees represent just less than 10% of the $2.9 million initially deposited in the Indirect Purchaser Settlement Account. It, too, will be granted in full.

It is therefore, this 21st day of May, 2002,

ORDERED, that the motion for attorneys' fees and expenses by direct purchasers' class counsel [32–1 and 32–2] is granted in part and denied in part; and it is

FURTHER ORDERED, that direct purchasers' class counsel are awarded a fee of $2.4 million and all litigation expenses requested; and it is

FURTHER ORDERED, that the motion for attorneys' fees and expenses by class counsel for the indirect purchaser settlement class [30] is granted in its entirety; and it is

FURTHER ORDERED, that the motion by the Federal Trade Commission to file an amicus brief [35–2] is denied as moot.